UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

SHAQUILLE E. HAZELWOOD,

      Petitioner

v.

JERRY HOWELL, et al.,

      Respondents.

Case No.: 3:14-cv-00022-LRH-WGC

**ORDER**

## I.    INTRODUCTION

This case is a petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, by Shaquille Hazelwood, a Nevada prisoner. This case is before the Court for adjudication of the merits of Hazelwood's remaining claims. The Court will deny Hazelwood's habeas petition, will deny him a certificate of appealability, and will direct the Clerk of the Court to enter judgment accordingly.

## II.    BACKGROUND

At approximately 6:00 a.m. on April 22, 2007, the victim, Cheryl Black, drove to an alleyway in Las Vegas, Nevada, which was known for being a drug and crime area, to purchase some drugs. ECF No. 20-5 at 69-70, 76-77; ECF No. 21-2 at 107. While still in the driver's seat

of her vehicle, the victim purchased drugs from Hazelwood through the passenger-side window. ECF No. 20-5 at 86-87. Following the transaction and deciding that she wished to make another purchase, the victim retrieved her money and started counting it. *Id.* at 87. Hazelwood, upon noticing the large sum of money, ran from the passenger side of the vehicle to the driver's side of the vehicle, pulled out a gun, and pointed the gun at the victim through the open window. *Id.* at 87-88. Hazelwood demanded that the victim give him her money, and when she refused and attempted to drive away, Hazelwood shot the victim in her head. *Id.* at 88-89.

Following a jury trial in Nevada's Eighth Judicial District Court, Hazelwood was convicted of first-degree murder with the use of a deadly weapon and attempted robbery with the use of a deadly weapon. ECF No. 21-7 at 2. Hazelwood was sentenced to 20 years to life for the first-degree murder conviction plus an equal and consecutive term of 20 years to life for the deadly weapon enhancement and 24 to 60 months for the attempted robbery conviction plus an equal and consecutive term of 24 to 60 months for the deadly weapon enhancement. *Id.* at 3. The Nevada Supreme Court affirmed Hazelwood's convictions. ECF No. 22-4.

Hazelwood filed a state petition for a writ of habeas corpus. ECF No. 22-7. Hazelwood later filed a counseled, supplemental petition. ECF No. 22-13. The state district court denied Hazelwood's petition, and the Nevada Supreme Court affirmed. ECF No. 22-22; ECF No. 22-28.

Hazelwood dispatched his federal habeas petition on or about December 16, 2013. ECF No. 12. Hazelwood's counseled, first-amended petition was filed on November 13, 2014. ECF No. 18. Hazelwood's first-amended petition alleges the following violations of his federal constitutional rights:

1. His trial counsel was ineffective:
   A1. His trial counsel failed to properly advise him of the consequences of withdrawing his guilty plea.

|    |     | A2. | His trial counsel failed to move for the appointment of a guardian ad litem. |
|----|-----|-----|------|
|    |     | B.  | His trial counsel failed to move to suppress a witness's identification of him. |
|    |     | C.  | His trial counsel disclosed his juvenile criminal record and detention. |
|    |     | D.  | His trial counsel failed to request an instruction on the lesser-included offense of voluntary manslaughter. |
|    | 2.  |     | The state district court erred in permitting him to withdraw his voluntary guilty plea. |
|    | 3.  |     | The state district court allowed the introduction of improper victim-impact evidence. |
|    | 4.  |     | The state district court allowed the introduction of evidence that witnesses felt threatened or afraid, despite the lack of evidence that Hazelwood threatened or caused them to be threatened. |
|    | 5.  |     | There were cumulative errors. |

*Id.* The Respondents filed a motion to dismiss Hazelwood's first-amended petition. ECF No. 26. Hazelwood opposed the motion, and the Respondents filed a reply. ECF Nos. 31, 34. This Court granted the Respondents' motion in part. ECF No. 38. Specifically, this Court dismissed Ground 1(A)(1) with prejudice as procedurally defaulted. *Id.* at 7. The Respondents filed an answer to the remaining grounds in Hazelwood's first-amended petition on August 22, 2017. ECF No. 51. Hazelwood filed a reply on March 7, 2018. ECF No. 59.

## III.   STANDARD OF REVIEW

28 U.S.C. § 2254(d) sets forth the standard of review generally applicable in habeas corpus cases under the Antiterrorism and Effective Death Penalty Act ("AEDPA"):

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim --

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A state court decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254, "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000), and citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)). A state court decision is an unreasonable application of clearly established Supreme Court precedent within the meaning of 28 U.S.C. § 2254(d) "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 75 (quoting *Williams*, 529 U.S. at 413). "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous. The state court's application of clearly established law must be objectively unreasonable." *Id.* (quoting *Williams*, 529 U.S. at 409-10) (internal citation omitted).

The Supreme Court has instructed that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has stated "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102 (citing *Lockyer*, 538 U.S. at 75); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the standard as a "difficult to meet" and "highly deferential standard for evaluating

4

state-court rulings, which demands that state-court decisions be given the benefit of the doubt" (internal quotation marks and citations omitted)).

## IV. DISCUSSION

### A. Ground 1(A)(2)[1]

In Ground 1(A)(2), because he was only sixteen years old, Hazelwood argues that his federal constitutional rights were violated when his trial counsel failed to move for the appointment of a guardian ad litem when Hazelwood sought the withdrawal of his guilty plea. ECF No. 18 at 12. Hazelwood explains that he was prejudiced by this deficiency because if his trial counsel had moved for this appointment, that motion would have been granted, and he would have not withdrawn his guilty plea and received a stricter sentence. *Id.* at 13-14. Hazelwood elaborates that aside from his trial counsel, he had no responsible adult providing guidance in his life, he suffered abuse at home, he had documented mental health issues, and he was immature and unable to process and make complex legal decisions. *Id.* at 12-13. Hazelwood contends that while there is no statute in Nevada specifically providing for the appointment of a guardian ad litem in a criminal case, there is also no statute in Nevada specifically precluding the appointment of a guardian ad litem in a criminal case. ECF No. 59 at 11.

In Hazelwood's state habeas appeal, the Nevada Supreme Court held:

> Hazelwood argues that trial counsel was ineffective for failing to request that a guardian ad litem be appointed when he moved to withdraw his guilty plea because of his age. Hazelwood fails to demonstrate that an objectively reasonable attorney in trial counsel's place would have requested such an appointment as Hazelwood alleges no standard of statutory requirement that a criminal defendant be appointed a guardian ad litem because of age, immaturity, social background, or decision-making skills. Insomuch as Hazelwood argues that he needed a guardian ad litem to make his legal decisions for him, "[t]he decision of how to plead in a criminal case is a fundamental one reserved ultimately to the defendant alone." *Parker v.*

---

[1] This Court dismissed Ground 1(A)(1) with prejudice as procedurally defaulted. ECF No. 38 at 7.

*State*, 100 Nev. 264, 265, 679 P.2d 1271, 1272 (1984); *see also Robinson v. State*, 110 Nev. 1137, 1138, 881 P.2d 667, 668 (1994) (once a child is certified as an adult, he "is no longer a child in the eyes of the criminal law"). Further, Hazelwood fails to demonstrate a reasonable probability that the outcome would have been different as the district court appointed special counsel for the limited purpose of reviewing the motion and advising Hazelwood on his plea withdrawal, and, after conferring with special counsel and being thoroughly canvassed by the district court on his decision, Hazelwood chose to withdraw his guilty plea and proceed to trial.

ECF No. 22-28 at 3-4.

Hazelwood was charged with murder with the use of a deadly weapon and robbery with the use of a deadly weapon. ECF No. 19-4. Hazelwood, who was sixteen years old, pleaded not guilty at his initial arraignment on August 22, 2007. ECF No. 19-5. During a calendar call hearing on October 24, 2007, Hazelwood's trial counsel informed the state district court that the State had made a reasonable offer to Hazelwood. ECF No. 19-6 at 3. The state district court continued the previously-set trial date to allow Hazelwood's trial counsel time to explain the offer to Hazelwood. *Id.* at 4. On December 13, 2007, Hazelwood sought a hearing for the purpose of changing his plea. ECF No. 19-7. The change of plea hearing was held on December 19, 2007. ECF No. 19-9. Hazelwood's trial counsel informed the state district court that the case had been negotiated, but Hazelwood had since decided to proceed to trial. *Id.*

At the calendar call hearing on March 5, 2008, Hazelwood's trial counsel informed the state district court that the case had been negotiated. ECF No. 19-12. An amended information was filed during the hearing charging Hazelwood with voluntary manslaughter with the use of a deadly weapon and robbery with the use of a deadly weapon. ECF No. 19-11. The state district court canvassed Hazelwood and accepted his guilty plea. ECF No. 19-12 at 4-8; *see also* ECF No. 19-10 (executed guilty plea agreement).

At his sentencing hearing on July 2, 2008, Hazelwood's trial counsel informed the state district court that Hazelwood wished to withdraw his plea because the guilty plea agreement indicated that he was eligible for probation on both charges when that was not true. ECF No. 37-1 at 4-5; *see also* ECF No. 21-6 (statement by Hazelwood's trial counsel during his later sentencing on June 24, 2009, that "it appears to counsel that part of what caused this young man, this minor child, to back out of negotiations was somehow or another to punish his mother"). The state district court indicated that there was "an incorrect statement at line 21 and 23 on page 2 of the guilty plea agreement." ECF No. 37-1 at 6. The state district court then appointed attorney James Ruggeroli "for the special and limited purpose of consulting with [Hazelwood] and reviewing the file" to "mak[e] a determination if [he], in [his] best legal judgment, believes there is a basis for [Hazelwood] to file a motion to withdraw his plea." *Id.* at 10. The state district court explained to Hazelwood that it was appointing Mr. Ruggeroli "[b]ecause there might be a conflict between the special public defender's office and [Hazelwood] in evaluating whether they did the best job for you in explaining the guilty plea agreement." *Id.* at 11.

Mr. Ruggeroli filed a motion to withdraw Hazelwood's guilty plea on September 26, 2008. ECF No. 19-19. A hearing was held on the motion on October 1, 2008. ECF No. 19-20. At the hearing, the State indicated that it was "not opposing the motion" and was "look[ing] forward to taking this case to trial" because "[i]n hindsight . . . it was a mistake to offer him a deal anyway." *Id.* at 4. The state district court granted the motion, reinstated the original information, and clarified with Hazelwood whether he "still want[ed] to go forward and withdraw [his] guilty plea" since he was "facing life without the possibility of parole if [he was] found guilty." *Id.* at 5. Hazelwood confirmed that he wanted to withdraw his guilty plea. *Id.* The state district court reappointed the special public defender's office and discharged Mr. Ruggeroli. *Id.* at 6.

In *Strickland v. Washington*, the Supreme Court propounded a two-prong test for analysis of claims of ineffective assistance of counsel requiring the petitioner to demonstrate (1) that the attorney's "representation fell below an objective standard of reasonableness," and (2) that the attorney's deficient performance prejudiced the defendant such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. 668, 688, 694 (1984). A court considering a claim of ineffective assistance of counsel must apply a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The petitioner's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. And, to establish prejudice under *Strickland*, it is not enough for the habeas petitioner "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. Rather, the errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687.

Where a state district court previously adjudicated the claim of ineffective assistance of counsel, under *Strickland*, establishing that the decision was unreasonable is especially difficult. *See Harrington*, 562 U.S. at 104-05. In *Harrington*, the United States Supreme Court instructed:

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," [*Strickland*, 466 U.S. at 689]; *Lindh v. Murphy*, 521 U.S. 320, 333, n.7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles*[ *v. Mirzayance*, 556 U.S. 111, 123 (2009)]. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at 123, 129 S.Ct. at 1420. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonably argument that counsel satisfied *Strickland*'s deferential standard.

*Harrington*, 562 U.S. at 105; *see also Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010) ("When a federal court reviews a state court's *Strickland* determination under AEDPA, both AEDPA and *Strickland*'s deferential standards apply; hence, the Supreme Court's description of the standard as 'doubly deferential.'").

In analyzing a claim of ineffective assistance of counsel under *Strickland*, a court may first consider either the question of deficient performance or the question of prejudice; if the petitioner fails to satisfy one element of the claim, the court need not consider the other. *See Strickland*, 466 U.S. at 697.

Hazelwood asserts that his trial counsel was ineffective under *Strickland* because she did not move for the appointment of a guardian ad litem. Nevada law provides generally that "[a]ny court of competent jurisdiction may appoint . . . [g]uardians ad litem." Nev. Rev. Stat. § 159A.0487(4). However, while Nevada law allows for the appointment of a guardian ad litem in a civil context, there is no statutory provision governing the appointment of a guardian ad litem in the criminal context. *Cf.* Nev. R. Civ. P. 17(c)(2) ("The court must appoint a guardian ad litem—or issue another appropriate order—to protect a minor or incapacitated person who is not represented in an action."); Nev. Rev. Stat. § 65.010 (indicating that a guardian ad litem is appointed for an infant or insane or incapacitated person). Therefore, while it would not have been amiss to move for the appointment of a guardian ad litem, there was no obligation or provision that demanded that Hazelwood's trial counsel do so in this criminal context.

This Court acknowledges that Hazelwood had a troubled background and social history, *see* ECF No. 19-17 (Hazelwood's trial counsel's sentencing memorandum highlighting Hazelwood's worrisome upbringing), and that "children are constitutionally different from adults for purposes of sentencing," *Miller v. Alabama*, 567 U.S. 460, 471 (2012) (explaining that

"children have a lack of maturity and an underdeveloped sense of responsibility, . . . children are more vulnerable . . . to negative influences and outside pressures, . . . [and children] have limited contro[l] over their own environment and lack the ability to extricate themselves from horrific, crime-producing settings") (internal quotation marks and citations omitted), as was pointed out by Hazelwood. Nonetheless, this does not change the fact that there was no requirement for Hazelwood's trial counsel to move for the appointment of a guardian ad litem. Accordingly, it cannot be determined that Hazelwood's trial counsel's actions "fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688.

Moreover, it is worth noting that the state district court appointed Mr. Ruggeroli "for the special and limited purpose of consulting with [Hazelwood] and reviewing the file" to "mak[e] a determination if [he], in [his] best legal judgment, believe[d] there [was] a basis for [Hazelwood] to file a motion to withdraw his plea." ECF No. 37-1 at 10. While he was not appointed as a guardian ad litem, Mr. Ruggeroli's role in consulting with Hazelwood for the precise purpose of determining whether Hazelwood should continue to move to withdraw his plea was similar to the role that a guardian ad litem would have played. However, Hazelwood, with the assistance of Mr. Ruggeroli, still decided to move to withdraw his plea. *See* ECF No. 19-19; ECF No. 19-20 at 5. Therefore, it is mere speculation that Hazelwood would have decided to preserve his guilty plea even if a guardian ad litem had been appointed. *See Djerf v. Ryan*, 931 F.3d 870, 881 (9th Cir. 2019) ("*Strickland* prejudice is not established by mere speculation.").

Thus, the Nevada Supreme Court's ruling that "Hazelwood fails to demonstrate that an objectively reasonable attorney in trial counsel's place would have requested such an appointment," ECF No. 22-28 at 3, was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, and was not based on an

unreasonable determination of the facts in light of the evidence. *See* 28 U.S.C. § 2254(d). The Court will deny Hazelwood habeas corpus relief with respect to Ground 1(A)(2).

**B.      Ground 1(B)**

In Ground 1(B), Hazelwood argues that his federal constitutional rights were violated when his trial counsel failed to move to suppress a witness's identification of him. ECF No. 18 at 14. Hazelwood explains that Claire Daniels identified him through an unreliable, single photographic lineup; that Daniels was a long-term drug addict; and that Daniels was inconsistent in her testimony regarding how long she knew him. *Id.* at 14-15. The Respondents argue that Daniels' identification of Hazelwood was not impermissibly suggestive because she knew Hazelwood before the shooting. ECF No. 51 at 10.

In Hazelwood's state habeas appeal, the Nevada Supreme Court held:

> Hazelwood claims that trial counsel was ineffective for failing to file a motion to suppress the eyewitness identification by Claire Daniels because it was unnecessarily suggestive, she abused drugs, and her testimony as to how long she knew Hazelwood before the incident was impeached. A review of the record reveals that Daniels told the officer that she knew the shooter and identified him by name prior to being shown any photograph. After being shown a photograph of Hazelwood taken from when he was younger, Daniels immediately identified him as the shooter but said that he looked younger in the picture. Given the strong identification by Daniels, counsel's conduct did not fall below an objective standard of reasonableness. Furthermore, Hazelwood failed to demonstrate that a motion to suppress the eyewitness identification had a reasonable likelihood of success. *Doyle v. State*, 116 Nev. 148, 154, 995 P.2d 465, 469 (2000) (holding that, where a claim of ineffective assistance is based on counsel's failure to file a motion to suppress, prejudice must be demonstrated by "showing that the claim was meritorious and that there was a reasonable likelihood that the exclusion of the evidence would have changed the result of a trial" (internal quotation marks omitted)). As for the claims that Daniels abused drugs and that her testimony regarding the length of time she had known Hazelwood was impeached, these claims went to the weight and credibility of Daniels' testimony and were "within the exclusive province of the jury." *White v. State*, 95 Nev. 881, 885, 603 P.2d 1063, 1065 (1979). Accordingly, trial counsel was not deficient, and the district court did not err in denying this claim.

ECF No. 22-28 at 4-5.

Daniels testified that she lived in a home near the alleyway where the shooting took place. ECF No. 20-5 at 3, 6. On April 22, 2007, Daniels was walking through the alley "to see a church member," when she saw the victim, who looked familiar. *Id.* at 7, 15. Daniels explained that Hazelwood was at the victim's car, and "[a]s [she] approached the car, . . . [Hazelwood] looked at [her], and [she] looked at him." *Id.* at 64-65. Daniels was speaking to the victim through the driver-side window and asked if she could have "a hit" of the drugs that the victim had just purchased from Hazelwood. *Id.* at 17, 20-21. Hazelwood saw the victim's money through the passenger-side window, ran around the front of the vehicle, pulled a gun out from his waist, and pointed the gun at the victim. *Id.* at 22-23. Daniels heard Hazelwood tell the victim to give him the money and heard the victim's passenger, Aaron Noble, tell the victim to leave. *Id.* at 25-26. Daniels then saw Hazelwood shoot the victim in her head. *Id.* at 26.

Daniels testified that she knew "Hazelwood from hanging around in the alley." *Id.* at 12. During direct examination, she explained that she knew Hazelwood for "five, five to ten years or more." *Id.* at 13. However, during cross examination, Daniels clarified that she met Hazelwood when he was "teenage age," which calculated to only knowing him for much less time. *Id.* at 57-58.

Daniels explained that Detective Clint Ryan came to talk to her "a week and [a] half to two weeks after" the shooting. *Id.* at 30-31. The State asked Daniels about that interview:

> Q.   Okay. And when you did talk to Detective Ryan, whenever that was, were you able to tell him who was the person that had shot Cheryl Black in that alley?
> A.   Yes. After he showed me pictures, I pointed out who it was.
> Q.   Well - -
> A.   And he asked me - -

| | | |
|---|---|---|
| Q. | But hold on a second now. Didn't you tell him who it was before he showed you the pictures? Did you know the - - you knew - - did you know the person's name that had - - |
| A. | Yes. |
| Q. | Okay. And did you tell Detective Ryan that? |
| A. | Yes. Yes. Yes. |
| Q. | And that was before he showed you the pictures, wasn't it? |
| A. | And he showed me the pictures to make sure, yes. |
| Q. | Okay. And then when you saw the picture, what happened? |
| A. | I looked at it and I said, that look [sic] like him but then he looked a little younger. |
| Q. | Right. |
| A. | And he said, but it - - he is younger in that picture. Who at - - |
| Q. | Do you - - |
| A. | I recognized it, although he was a few years older than that. |

. . .

| | |
|---|---|
| Q. | Okay. And you gave a description of Shaquille, of the shooter and of Shaquille Hazelwood - - |
| A. | Yes. |
| Q. | - - to Detective Ryan, didn't you? Do you remember what you said to Detective Ryan? |
| A. | That he was brown skinned, not like (unintelligible) cut, but close-cut hair, it's kinda like - - I'd say like a little short natural, and that he was like not tall, but not short, a little stocky like. |

*Id.* at 31-33.

During the preliminary hearing, Daniels answered "I think he is" when asked if the person who shot Cheryl Black was in the courtroom. *Id.* at 62-63. During the trial, Daniels explained this statement: "I do wear glasses, okay, and . . . I was sitting there and like was - - he's somewhat dark complected [sic], and he had on blue. And I had to focus for a minute. I said, I think he is. But then, yes, it was him." *Id.* at 66. Daniels testified at the trial that there was no "doubt in [her] mind" that Hazelwood was "the man that shot Cheryl Black in that alley." *Id.* at 36.

Detective Ryan testified that on April 25, 2007, a search warrant was executed by Officer Arnona at Shalmane Owens' apartment, which was near the alleyway where the victim was

killed, for drugs. ECF No. 21-2 at 106-07, 112, 116. During that search, Officer Arnona recovered a Glock .40 caliber semiautomatic handgun. *Id.* at 117. Owens told Officer Arnona that the gun belonged to Hazelwood, who resided with Owens. *Id.* Based on this information, Hazelwood became a suspect in the investigation. *Id.* at 121.

Detective Ryan conducted an interview with Daniels on April 27, 2007. *Id.* at 121. Detective Ryan testified about that interview:

> Q. Okay. Did you eventually ask - - now, listen to my question carefully. Did you ask Ms. Daniels the name of the person that did the shooting? That's a yes or no question.
> A. Yes.
> Q. And after she told you the name, did you show her a photograph of this defendant right here, Shaquille Hazelwood?
> A. Yes.
> Q. What was her reaction when you showed her the photograph of Shaquille Hazelwood?
> A. She gasped, I guess, is the best way I could try to describe it. She just kind of took a deep breath in and said, That's him. And then she said, That's him when he was younger, was actually, I believe, what she said.
> Q. Did she begin crying upon seeing the photograph?
> A. Yes, she did.

*Id.* at 122-23. Detective Ryan also explained that the photograph of Hazelwood presented to Daniels was two to three years old, meaning that Hazelwood was thirteen or fourteen years old at the time the photograph was taken. *Id.* at 130.

"To constitute a due process violation, the photographic identification procedure must be so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Denham v. Deeds*, 954 F.2d 1501, 1504 (9th Cir. 1992); *see also Simmons v. United States*, 390 U.S. 377, 384 (1968) (holding that "convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to

give rise to a very substantial likelihood of irreparable misidentification"). The court engages in a two-step inquiry when determining whether a pretrial identification procedure violates a suspect's due-process rights. *United States v. Love*, 746 F.2d 477, 478 (9th Cir. 1984). "First, it must be determined whether the procedures used were impermissibly suggestive. If so, it must then be determined whether the identification was nonetheless reliable." *Id.* In determining the likelihood of misidentification, the following factors are considered:

> the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*Neil v. Biggers*, 409 U.S. 188, 199-200 (1972).

Turning first to the question of whether the procedures used were impermissibly suggestive, Daniels was shown the photograph of only one individual: Hazelwood. ECF No. 21-2 at 123. And "identifications arising from single-photograph displays may be viewed in general with suspicion." *Mason v. Brathwaite*, 432 U.S. 98, 116 (1977) (explaining that "it would have been better had [the officer] presented [the witness] with a photographic array including 'so far as practicable . . . a reasonable number of persons similar to any person then suspected whose likeness is included in the array'"). However, Daniels testified that she knew the name of the shooter before the photograph was shown, that she told Detective Ryan the name of the shooter before the photograph was shown, and that the photograph was only shown to confirm that the shooter was Hazelwood. *See* ECF No. 20-5 at 31. Accordingly, because Daniels was able to identify the shooter without the need to select him from an array of individuals in a photographic lineup and because the single photograph of Hazelwood was only used to confirm Daniels'

identification of Hazelwood, it cannot be concluded that the procedures used were impermissibly suggestive. *See Love*, 746 F.2d at 478.

However, even if the procedures used were impermissibly suggestive, assessment of the *Biggers* factors as a whole confirm that Daniels' identification of Hazelwood was reliable. First, Daniels had an adequate opportunity to view the shooter at the time of the crime: Daniels testified that "[a]s [she] approached the car, . . . [Hazelwood] looked at [her], and [she] looked at him." ECF No. 20-5 at 64-65. Second, Daniels' degree of attention appears to be somewhat lacking. Although Daniels testified that she knew "Hazelwood from hanging around in the alley," she initially stated that she had known Hazelwood for up to ten years but then later altered that to only knowing him for a few years. *Id.* at 12-13, 57-58. Also, Daniels admitted to smoking crack cocaine the night before the shooting, which may have impaired her degree of attention. *See id.* at 37. Third, Daniels was able to describe the shooter—Hazelwood—with what appears to be sufficient accuracy prior to being shown his photograph. *See id.* at 33 (describing Hazelwood as being "brown skinned, not like (unintelligible) cut, but close-cut hair, it's kinda like - - I'd say like a little short natural, and that he was like not tall, but not short, a little stocky like"); *see also* ECF No. 21-2 at 129 (testimony of Detective Ryan that Hazelwood was 5'6" or 5'7" when he was arrested). Fourth, Daniel's level of certainty at the confrontation was fairly strong. Detective Ryan testified that Daniels "gasped" when she saw Hazelwood's photograph. ECF No. 21-2 at 123. He also explained that "[s]he just kind of took a deep breath in and said, That's him." *Id.* Fifth, the length of time between the shooting and the confrontation is a little attenuated, but not overly so. The shooting happened on April 22, 2007, *see* ECF No. 20-5 at 14, and Daniels' interview with Detective Ryan, in which she was shown the photograph of Hazelwood, was conducted five days later on April 27, 2007. ECF No. 21-2 at 121.

Although Daniels' degree of attention may have been lacking, after assessing the totality of the circumstances, it cannot be concluded that Daniels' identification violated Hazelwood's right to due process. *See Manson*, 432 U.S. at 116 ("Surely, we cannot say that under all the circumstances of this case there is 'a very substantial likelihood of irreparable misidentification.'" (citation omitted)). Because Daniels' identification of Hazelwood did not violate his right to due process, his trial counsel's "representation [did not] f[a]ll below an objective standard of reasonableness" in not filing a motion to suppress Daniels' identification, as such a motion would not have been meritorious. *Strickland*, 466 U.S. at 688; *see also Ortiz-Sandoval v. Clarke*, 323 F.3d 1165, 1170 (9th Cir. 2003) ("[P]etitioner must show that (1) the overlooked motion to suppress would have been meritorious and (2) there is a reasonable probability that the jury would have reached a different verdict absent the introduction of the unlawful evidence." (citing *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986)). Therefore, the Nevada Supreme Court's ruling was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, and was not based on an unreasonable determination of the facts in light of the evidence. *See* 28 U.S.C. § 2254(d). The Court will deny Hazelwood habeas corpus relief with respect to Ground 1(B).

**C.     Ground 1(C)**

In Ground 1(C), Hazelwood argues that his federal constitutional rights were violated when his trial counsel disclosed his juvenile criminal record and detention to the jury. ECF No. 18 at 16. Hazelwood elaborates that it was an unreasonable strategy for his trial counsel to have elicited this evidence because it diluted the presumption of innocence. *Id.* In Hazelwood's state habeas appeal, the Nevada Supreme Court held:

> Third, Hazelwood argues that trial counsel was ineffective for disclosing his incarceration pending trial. In reviewing claims of ineffective assistance of

counsel, this court has stated that "a tactical decision . . . is 'virtually unchallengeable absent extraordinary circumstances.'" *Doleman v. State*, 112 Nev. 843, 848, 921 P.2d 278, 280-81 (1996) (quoting *Howard v. State*, 106 Nev. 713, 722, 800 P.2d 175, 180 (1990) *abrogated on other grounds by Harte v. State*, 116 Nev. 1054, 1072 n.6, 13 P.3d 420, 432 n.6 (2000)). Hazelwood has not demonstrated extraordinary circumstances. During opening statements, counsel disclosed that Hazelwood was incarcerated pending trial when she referenced the fact that Aaron Noble, one of the State's witnesses to the shooting who had told officers he would never forget the shooter, shared a cell with Hazelwood for about a week and did not recognize him. We conclude that trial counsel's decision to disclose Hazelwood's custodial status in order to attack Noble's eyewitness identification was not unreasonable, and the district court did not err in denying this claim.

Fourth, Hazelwood argues that trial counsel was ineffective for disclosing his prior juvenile conduct. On cross-examination of the lead detective, counsel asked the officer whether he contacted Spring Mountain Youth Camp regarding Hazelwood, to which the officer answered in the affirmative, and what his purpose was in contacting the camp, but a bench conference was held before the officer answered. Outside the presence of the jury, trial counsel explained that her line of questioning was a strategic decision. We conclude that Hazelwood has failed to demonstrate extraordinary circumstances to challenge counsel's tactical decision and that counsel's performance was not deficient. *Id.* Furthermore, Hazelwood has failed to show prejudice, as the jury was never informed that the camp was a juvenile detention facility or that Hazelwood was ever detained there. Therefore, the district court did not err in denying this claim. [Footnote 2: To the extent that Hazelwood argues that testimony regarding his selling drugs in the alleyway where the murder occurred was a prior bad act that should have been challenged as inadmissible, we conclude that Hazelwood has failed to demonstrate that his counsel's performance was deficient. *See* NRS 48.045(2)].

ECF No. 22-28 at 5-6.

Hazelwood points to three alleged deficiencies committed by his trial counsel. First, during opening statements, Hazelwood's trial counsel explained that "[t]he evidence in this case will show that Shaquille Hazelwood probably was, in all likelihood, in that alley, probably, in all likelihood, selling drugs, along with many other people, many other people." ECF No. 20-4 at 25, 27. Second, also during opening statements, Hazelwood's trial counsel explained that:

Aaron Noble, later on, early part of '08, gets into some trouble and the trouble that he winds up in -- and you will hear about that -- and he's in jail and he ultimately

goes to prison for this and he's going to come to you from prison in this case. He's placed in the same cell with Shaquille Hazelwood. And according to Mr. Noble, Aaron Noble, they're sitting there playing cards for the better part of a week and then Mr. Hazelwood says, You don't remember me, whereupon Mr. Noble says, Oh, my gosh, you're the guy, you're the guy. He's been playing cards with him for the better part of a week.

*Id.* at 31-32; *see also* ECF No. 20-5 at 102 (noting a lack of objection by Hazelwood's trial counsel when the State asked Noble during direct examination if he was "ever housed in the same module as the defendant" at the Clark County Detention Center).

Third, during Hazelwood's trial counsel's cross-examination of Detective Ryan, Hazelwood's trial counsel asked if he "contact[ed] Spring Mountain Youth Camp regarding Mr. Hazelwood." ECF No. 21-2 at 106-07, 136. After Detective Ryan answered in the affirmative, Hazelwood's trial counsel then asked "what [his] purpose [was] in contacting Spring Mountain Youth Camp." *Id.* at 136. A bench conference was held at the request of the State. *Id.* Thereafter, Hazelwood's trial counsel moved on with her questioning. *See id.* Later, outside the presence of the jury, the state district court brought up the bench conference and explained "[w]e came up to the bench because there was a concern expressed. I was told it wasn't an issue by the defendant. They were merely doing it for the source of the photograph. We all said, Are [sic] you really sure, and we went on about our business." *Id.* at 151. Hazelwood's trial counsel then explained the reasoning behind her question about the Spring Mountain Youth Camp:

The record will reflect that I don't believe that this jury or any reasonable juror would be surprised, and they've heard that the defendant, my client, Mr. Hazelwood, was 15 years old at the time that he was charged with this crime. They have also heard testimony that he was staying here, that he was staying there, he was in the alley selling dope. So even if there were some nexus for down the line when some federal public defender who's much smarter than I am believes that this is some kind of issue, it would be my considered opinion that this jury would be aware that Mr. Hazelwood was having some juvenile issues.

1  *Id.* Hazelwood's trial counsel then answered in the affirmative when the state district court

2  clarified, "so this is a strategic decision on the part of the defense?" *Id.*

3       Turning first to Hazelwood's trial counsel's statement that Hazelwood was likely selling

4  drugs in the alleyway, ECF No. 20-4 at 27, it cannot be determined that this comment "fell below

5  an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. The State had already told

6  the jury that Hazelwood was selling drugs. *See* ECF No. 20-4 at 17 (opening statement of the

7  State commenting that "Hazelwood was selling rock cocaine in the alley and Cheryl - - I'm

8  sorry, Claire brought him over to the vehicle to sell the drugs to Cheryl"). And due to the

9  circumstances that brought the victim to the alleyway in the early morning hours of April 22,

10 2007, it was reasonable for Hazelwood's trial counsel to have assumed that testimony showing

11 that Hazelwood was selling drugs would be presented. Therefore, it was sound trial strategy for

12 Hazelwood's trial counsel to have been forthright in conceding that fact in order to gain integrity

13 with the jury. *See Yarborough v. Gentry*, 540 U.S. 1, 9 (2003) (rejecting argument that defense

14 counsel was ineffective for referring to his client as a "'bad person, lousy addict, stinking thief,

15 jail bird'" since "[b]y candidly acknowledging his client's shortcomings, counsel might have

16 built credibility with the jury and persuaded it to focus on the relevant issues in the case"); *see*

17 *also Fairbanks v. Ayers*, 650 F.3d 1243, 1255 (9th Cir. 2011) ("Even though at times trial

18 counsel did not paint [the defendant] in the most sympathetic light, counsel cannot be deemed

19 ineffective for attempting to impress the jury with his candor and his unwillingness to engage in

20 a useless charade." (internal quotation marks and citation omitted)).

21       Turning next to Hazelwood's trial counsel's comment that Hazelwood and Noble shared

22 a cell at the jail, *see* ECF No. 20-4 at 31-32, *see also* ECF No. 20-5 at 102 (noting Hazelwood's

23 trial counsel's lack of an objection when the State asked Noble about being housed in the same

jail as Hazelwood), it also cannot be determined that this comment "fell below an objective

standard of reasonableness." *Strickland*, 466 U.S. at 688. One of Hazelwood's defenses was that

he was wrongly identified. *See* ECF No. 20-4 at 27 (argument of Hazelwood's trial counsel that

"the evidence in this case will show you that what's even more tragic is that the evidence does

not provide enough information for you to discern who did it. It just isn't enough") at 31

("[Noble's] description given at the interview that is immediately following the shooting does

not square with the appearance of Shaquille Hazelwood."). Hazelwood's trial counsel's emphasis

on the fact that Noble did not recognize Hazelwood even though they shared a jail cell for a

week aids this defense.

       Finally, Hazelwood's trial counsel asked Detective Ryan why he contacted Spring

Mountain Youth Camp, ECF No. 21-2 at 136; however, before he could answer, there was a

bench conference. Although Hazelwood's trial counsel later explained that she was planning to

inquire about the Spring Mountain Youth Camp due to her belief that the jury would not be

surprised to learn that Hazelwood had juvenile delinquency issues, *see id.* at 151, there does not

appear to have been any reason to go into Hazelwood's connection with the Spring Mountain

Youth Camp. Indeed, the basis for asking Detective Ryan why he contacted the camp was to

demonstrate only where he obtained a photograph of Hazelwood. *See id.* However, even though

Hazelwood's trial counsel's purpose for inquiring into the camp seems extraneous, it cannot be

concluded that her questioning of Detective Ryan in this regard "fell below an objective standard

of reasonableness." *Strickland*, 466 U.S. at 688. *See Harrington*, 562 U.S. at 107 (2011)

("Counsel was entitled to formulate a strategy that was reasonable at the time."); *see also*

*Yarborough v. Gentry*, 540 U.S. 1, 8 (2003) ("The Sixth Amendment guarantees reasonable

competence, not perfect advocacy judged with the benefit of hindsight."). Moreover, there was

no discussion regarding the fact that the Spring Mountain Youth Camp was a detention center. Accordingly, even if Hazelwood's trial counsel was deficient, there was no prejudice to Hazelwood. *Strickland*, 466 U.S. at 694.

Therefore, the Nevada Supreme Court's ruling was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, and was not based on an unreasonable determination of the facts in light of the evidence. *See* 28 U.S.C. § 2254(d). The Court will deny Hazelwood habeas corpus relief with respect to Ground 1(C).

### D.    Ground 1(D)

In Ground 1(D), Hazelwood argues that his federal constitutional rights were violated when his trial counsel failed to request an instruction on the lesser-included offense of voluntary manslaughter. ECF No. 18 at 17. Hazelwood explains that there was evidence presented at the trial demonstrating that the victim's death may have been accidental, demonstrating that he acted without malice such that a voluntary manslaughter instruction would have been appropriate. *Id.*

In Hazelwood's state habeas appeal, the Nevada Supreme Court held:

> Hazelwood claims that trial counsel was ineffective for failing to request that the jury be instructed on the lesser-included offense of voluntary manslaughter. Hazelwood acknowledges that the existence of malice precludes an instruction on voluntary manslaughter. *Graves v. State*, 84 Nev. 262, 266, 439 P.2d 476, 478 (1968). However, Hazelwood argues that the jury could have reasonably concluded that the shooter was provoked by the victim's attempt to drive away while the shooter's arm was inside the vehicle and that the rapid acceleration caused the shooter to pull the gun's trigger. A review of the record reveals substantial evidence that Hazelwood acted with malice in shooting the victim, including but not limited to testimony that, after seeing the victim produce a bundle of money, Hazelwood walked around the car to where the victim was located, produced a gun, demanded that the victim give him all her money, and, after discharging the firearm opened the door and attempted to locate the victim's money. *See* NRS 200.020(2). We conclude that Hazelwood has failed to show that his counsel's performance was deficient.

ECF No. 22-28 at 6-7.

Noble, a friend of the victim, testified that the victim picked him up around 3:30 a.m. on April 22, 2007, so that they could purchase some drugs. ECF No. 20-5 at 68, 70-71. Noble explained that the victim had "around 740 bucks" with her to pay rent, but she was using some of that money to purchase drugs. *Id.* at 74-75. The victim bought some drugs in an alleyway from an individual, but the victim required change from the transaction. *Id.* at 80. While Noble and the victim were waiting for the change, their third passenger, who had exited the vehicle previously to find someone to buy drugs from, returned to the vehicle with Daniels and Hazelwood. *Id.* at 82-83. Daniels and the victim start conversing, Hazelwood left upon finding out that the victim had already purchased drugs from someone else, and the third passenger returned to the backseat of the vehicle. *Id.* at 83.

The victim then requested to buy some drugs from Daniels, who left to obtain the drugs. *Id.* at 84. Daniels was taking a long time to return, so the victim, Noble, and the third passenger decided to leave. *Id.* While the victim started to drive away, Daniels and Hazelwood appeared, so the victim stopped the car. *Id.* at 86. Hazelwood went to the passenger-side window, where Noble was seated, so the victim, who was driving the vehicle, handed her money to Noble who handed it to Hazelwood. *Id.* at 86-87. Hazelwood gave Noble the drugs, and Noble conversed with Hazelwood for a few minutes out of the passenger-side window while the victim spoke to Daniels out of the driver-side window. *Id.* at 87.

The victim decided to buy some more drugs from Daniels, so she retrieved her rent money and started to count it. *Id.* Noble told the victim to put the money away, which "brought Mr. Hazelwood's attention to the money." *Id.* Hazelwood then looked at Daniels, looked back at Noble, and then "just started around the car. By the time he got in front of the car he already had a gun pulled out." *Id.* at 88. When Hazelwood got to the driver's side of the car, he stuck "the

gun in the window and said, give me that money." *Id.* The victim said, "I can't believe you're going to rob me after I spent my money with you, and [then she] smashed on the gas." *Id.* Noble then explained:

> when [the victim] actually stepped on the gas, [Daniels] pushed Hazelwood. And while he had the gun in his hand in the window, when she pushed him, he hit -- he hit the gun on the window frame that goes down from the top of the car to the mirror, down toward -- down the side of the windshield. And when he hit that windshield, the gun went off. Now, if he meant to kill her I don't know. I really don't think so. But he still did it anyway.

*Id.* at 89.

Similarly, as explained previously, Daniels testified that Hazelwood saw the victim's money through the passenger-side window, ran around the front of the vehicle, pulled a gun out from his waist, and pointed the gun at the victim. *Id.* at 22-23. Daniels heard Hazelwood tell the victim to give him the money and heard Noble tell the victim to leave. *Id.* at 25-26. Daniels then saw Hazelwood shoot the victim in her head. *Id.* at 26.

Judy Fassette, a firearms and tool mark examiner with the Las Vegas Metropolitan Police Department, performed an examination on the semiautomatic firearm and the ammunition used to kill the victim. ECF No. 21-2 at 28-29, 32-33, 56. Ms. Fassette testified that the both safeties were functioning on the gun. *Id.* at 53. The State asked Ms. Fassette "if the gun were struck against a hard object like a wall or the frame of a vehicle, the window frame of a vehicle, could it discharge accidentally that way." *Id.* Ms. Fassette responded in the negative and explained that "the only way to discharge this gun would be to pull the trigger. As long as both safeties are functioning, it is necessary to pull the trigger, both the trigger safety and the trigger, to the rear in order to discharge this firearm." *Id.* at 53-54. Ms. Fassette also explained that she "determined

that it takes approximately 7 and a quarter to 7 and a half pounds of pressure . . . to discharge the firearm." *Id.* at 54.

The heart of Hazelwood's argument is that his trial counsel "fail[ed] to procure favorable jury instructions[, which] constituted ineffective assistance of counsel." *United States v. Alferahin*, 433 F.3d 1148, 1161 (9th Cir. 2006). Specifically, Hazelwood asserts that in addition to allowing the jury to determine whether he was guilty of first- or second-degree murder, *see* ECF No. 21-4 at 14, a lesser-included voluntary manslaughter option should have also been available. Accordingly, the issue is whether a voluntary manslaughter jury instruction was warranted by the facts of the crime and Nevada law such that Hazelwood's trial counsel was ineffective in not seeking the inclusion of such an instruction.

"Murder is the unlawful killing of a human being . . . [w]ith malice aforethought, either express or implied." Nev. Rev. Stat. § 200.010(1). Contrarily, "[m]anslaugther is the unlawful killing of a human being, without malice express or implied, and without any mixture of deliberation." Nev. Rev. Stat. § 200.040(1). "The presence of malice precludes an instruction on the crime of manslaughter." *Graves v. State*, 84 Nev. 262, 266, 439 P.2d 476, 478 (1968). "Express malice is that deliberate intention unlawfully to take away the life of a fellow creature, which is manifested by external circumstances capable of proof." Nev. Rev. Stat. § 200.020(1). And malice is "implied when no considerable provocation appears, or when all the circumstances of the killing show an abandoned and malignant heart." Nev. Rev. Stat. § 200.020(2).

An "[i]ntent to kill . . . may be ascertained or deduced from the facts and circumstances of the killing, such as use of a weapon calculated to produce death, the manner of use, and the attendant circumstances." *Dearman v. State*, 93 Nev. 364, 367, 566 P.2d 407, 409 (1977); *see also* Nev. Rev. Stat. § 193.200 ("Intention is manifested by the circumstances connected with the

perpetration of the offense."); *Sharma v. State*, 118 Nev. 648, 659, 56 P.3d 868, 875 (2002) ("[A] specific intent to kill may be inferred from an external circumstance, *i.e.*, the intentional use of a deadly weapon upon the person of another at a vital part."). Here, Noble testified that once Hazelwood noticed that the victim had a large sum of money on her person, he went around the front of the victim's car to the driver-side window where the victim was located, pulled out a gun, and demanded the victim's money. ECF No. 20-5 at 87-88. Hazelwood then fired the gun at the victim's head as she attempted to drive her vehicle away. *Id.* at 89. Daniels also testified that Hazelwood ran around the front of the victim's vehicle, pointed a gun at the victim, and then shot the victim in the head. *Id.* at 22-23, 26. Because Hazelwood pointed a gun at the victim in an attempt to rob her and then fired that weapon when she did not comply with his request to give him her money, an "[i]ntent to kill . . . may be . . . deduced." *Dearman*, 93 Nev. at 367, 566 P.2d at 409. Therefore, because the facts and circumstances demonstrate that Hazelwood acted with express malice, *see* Nev. Rev. Stat. § 200.020(1), an instruction on manslaughter was prohibited. *Graves*, 84 Nev. at 266, 439 P.2d at 478.

Hazelwood argues the following statement by Noble demonstrates that the killing could have been accidental: "when [Hazelwood] hit that windshield, the gun went off. Now, if he meant to kill her I don't know. I really don't think so." ECF No. 20-5 at 89. However, a firearms examiner testified that the gun would not have accidentally discharged if it "were struck against a hard object like a wall or the frame of a vehicle." ECF No. 21-2 at 53-54. Rather, she explained that "the only way to discharge this gun would be to pull the trigger." *Id.* at 54. Accordingly, this argument lacks merit.

Because a voluntary manslaughter jury instruction was not warranted by the facts of the crime and Nevada law, it cannot be determined that Hazelwood's trial counsel's actions in not

seeking to include this jury instruction "fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. Therefore, the Nevada Supreme Court's ruling that "Hazelwood has failed to show that his counsel's performance was deficient," ECF No. 22-28 at 7, was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, and was not based on an unreasonable determination of the facts in light of the evidence. *See* 28 U.S.C. § 2254(d). The Court will deny Hazelwood habeas corpus relief with respect to Ground 1(D).

## E.     Ground 2

In Ground 2, Hazelwood argues that his federal constitutional rights were violated when the state district court permitted him to withdraw his voluntary guilty plea. ECF No. 18 at 18. Hazelwood explains that although there was a typographical error in the guilty plea agreement, he did not provide any affidavit or verified statement indicating that he was, in fact, unaware that he would not receive probation and did not make any allegation that he was misled by his trial counsel. *Id.* at 19. Further, Hazelwood asserts that the state district court accepted his motion to withdraw his plea because the State vindictively did not oppose the motion, not because the state district court made a finding that there was a fair and just reason to permit withdrawal or that the plea was involuntary. ECF No. 59 at 27.

In Hazelwood's state direct appeal, the Nevada Supreme Court held:

> Hazelwood claims that the district court abused its discretion in granting his motion to withdraw his guilty plea. "It is a novel argument that constitutional rights are infringed by trying the defendant rather than accepting his plea of guilty," *Weatherford v. Bursey*, 429 U.S. 545, 561 (1977), and, where the defendant himself moved for the plea's withdrawal, it is an argument we reject as meritless.

ECF No. 22-4 at 4.

The federal constitutional guarantee of due process of law requires that a guilty plea be knowing, intelligent, and voluntary. *See Brady v. United States*, 397 U.S. 742, 748 (1970); *Boykin v. Alabama*, 395 U.S. 238, 242 (1969); *United States v. Delgado-Ramos*, 635 F.3d 1237, 1239 (9th Cir. 2011). "The voluntariness of [a petitioner's] plea can be determined only by considering all of the relevant circumstances surrounding it." *Brady*, 397 U.S. at 749. Addressing the "standard as to the voluntariness of guilty pleas," the Supreme Court has stated:

> (A) plea of guilty entered by one fully aware of the direct consequences, including the actual value of any commitments made to him by the court, prosecutor, or his own counsel, must stand unless induced by threats (or promises to discontinue improper harassment), misrepresentation (including unfulfilled or unfulfillable promises), or perhaps by promises that are by their nature improper as having no proper relationship to the prosecutor's business (e.g. bribes).

*Brady*, 397 U.S. at 755 (quoting *Shelton v. United States*, 246 F.2d 571, 572 n.2 (5th Cir. 1957), *rev'd on other grounds*, 356 U.S. 26 (1958)); *see also North Carolina v. Alford*, 400 U.S. 25, 31 (1970) (noting that the longstanding "test for determining the validity of guilty pleas" is "whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant").

As a reminder, Hazelwood changed his plea on March 5, 2008, after a successful negotiation with the State. ECF No. 19-12. Hazelwood executed a guilty plea agreement, which provided that, "[a]s to Count 2, I understand that I am eligible for probation for the offense to which I am pleading guilty. I understand that, except as otherwise provided by statute, the question of whether I receive probation is in the discretion of the sentencing judge." *See* ECF No. 19-10 at 3. This was a misstatement, as Hazelwood was not eligible for probation for this count, robbery with the use of a deadly weapon. *See* ECF No. 37-1 at 6; *see also* Nev. Rev. Stat. § 193.165(5)(d) ("The court shall not grant probation to or suspend the sentence of any person

who is convicted of using a firearm . . . in the commission of . . . [a r]obbery."). This mistake was not corrected during the state district court's canvass of Hazelwood, as there was no discussion of the probation issue. *See* ECF No. 19-12 at 7. On July 2, 2008, during his sentencing hearing, Hazelwood indicated that he had "been trying to withdraw [his] plea for like the last month . . . [b]ecause the plea agreement [he] signed, it says both of the charges are probation, but both of the charges are not probation." ECF No. 37-1 at 4-5. Hazelwood confirmed that he wished to withdraw his plea on October 1, 2008, after meeting with Mr. Ruggeroli, who was appointed for the purpose of discussing with Hazelwood the withdrawal of his plea. ECF No. 19-20 at 5; *see also* ECF No. 19-19 at 4 (statement in the motion to withdraw guilty plea that "[t]he record in this case is completely devoid of any evidence that Mr. Hazelwood knew that pleading guilty to robbery with use of a deadly weapon . . . is not probationable").

Hazelwood's assertion that the state district court granted his motion to withdraw his guilty plea only because the State did not oppose it is belied by the foregoing facts. Indeed, as Hazelwood stated during his original sentencing hearing and Mr. Ruggeroli informed the state district court in the motion to withdraw, there was a misstatement in the guilty plea agreement regarding whether Hazelwood was eligible for probation. *See* ECF No. 37-1 at 4-5; ECF No. 19-19 at 4. A guilty plea is voluntary only if "entered by one fully aware of the direct consequences." *Brady*, 397 U.S. at 755. Because Hazelwood essentially informed the state district court that he was unaware that he was ineligible for probation for the charge of robbery with the use of a deadly weapon, the state district court could—although it did not fully articulate its reasoning—have reasonably concluded that Hazelwood's guilty plea was not voluntary, thus necessitating the granting of his motion to withdraw the guilty plea.

Hazelwood contends that the state district court should have held an evidentiary hearing to determine if he really was unaware that he was ineligible for probation for the robbery with the use of a deadly weapon charge. This is paradoxical. Hazelwood requested to withdraw his guilty plea but now he argues that the state district court should not have granted this request before testing its legitimacy. Hazelwood cannot have it both ways: it is nonsensical to argue that a request should be granted and then later argue that the request was a mistake and should not have been granted.

Therefore, the Nevada Supreme Court's ruling was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, and was not based on an unreasonable determination of the facts in light of the evidence. *See* 28 U.S.C. § 2254(d). The Court will deny Hazelwood habeas corpus relief with respect to Ground 2.

## F.     Ground 3

In Ground 3, Hazelwood argues that his federal constitutional rights were violated when the state district court allowed the introduction of improper victim-impact evidence. ECF No. 18 at 21. Specifically, Hazelwood asserts that the State made repeated attempts to influence the jury and appeal to its sympathies by referring to the victim as the primary caretaker of her triplet, infant grandchildren. *Id.* In Hazelwood's state direct appeal, the Nevada Supreme Court held:

> Hazelwood contends that several references to the victim's grandchildren constituted improper victim-impact testimony. We are unpersuaded. *See Kaczmarek v. State*, 120 Nev. 314, 340, 91 P.3d 16, 34 (2004) (defining victim-impact evidence as testimony touching upon "the victim's personal characteristics and the emotional impact of the victim's death"); *see also Muhammad v. Commonwealth*, 619 S.E.2d 16, 54 (Va. 2005) (concluding that where "short biographical information about the victim" does not include "evidence of economic or psychological loss, or grief," it is not victim-impact evidence); *Commonwealth v. Hall*, 872 A.2d 1177, 1185-86 (Pa. 2005) (similar). Further, even if the testimony could be so characterized, evidence adduced at trial showed that the victim supported her grandchildren and intended to use the money which Hazelwood attempted to rob her to pay for their housing. That she had triplet grandchildren

made it more likely that she had not spent the entire amount on drugs and the fact that she displayed that amount of cash during the drug transaction establishes Hazelwood's motive to rob her. Because "[e]vidence relating to the facts attendant to the offense is clearly admissible during the guilt phase, even though it might be characterized as victim-impact evidence," *State v. McKnight*, 837 N.E.2d 315, 338 (Ohio 2005) (internal quotations omitted), we conclude that the district court did not abuse its discretion in admitting it. *See Wesley v. State*, 112 Nev. 503, 510, 916 P.3d 793, 798 (1996).

ECF No. 22-4 at 3.

Hazelwood takes issue with two comments made during the State's opening statement, the State's direct examination of two witnesses, and two comments made during the State's closing argument. First, during its opening statement, the State commented:

Cheryl asked Mr. Davis for some money, to loan her some money. She had expenses because she had grandchildren. She had triplets, grandchildren, that she needed expenses for and also rent money. So Mr. Davis loaned her about $200. She had other money together with that $200 and all told she had between 7 and $800 with her.

ECF No. 20-4 at 14. Later, the State commented:

Aaron urged Cheryl to go. She did not. He pulled this gun out of his pants and pointed it at Chery's head demanding money. At that point Cheryl had two choices. She could give up this money, this rent money that she needed for the babies and all of that, or she could step on the gas. And in her intoxicated condition, she made the decision to step on the gas.

*Id.* at 18.

Next, Elijah Davis, who had previously dated the victim, testified about loaning the victim some money:

    Q    Okay. And you said that she needed to borrow some money?
    A.    Yes, sir, for her rent. She had a home for her and her grandkids.
    Q.    How many grandkids did she have?
    A.    Three, triplets. They're triplets.
    Q.    Okay. I bet that was a handful.
    A.    Yes, and a surprise.
    Q.    And how old were the triplets?

ECF No. 21 at 5-7. Hazelwood's trial counsel lodged an objection, which was overruled. *Id.* at 7.

The State then continued:

> Q.    Let me lay a bit of a foundation first. Do you have any personal knowledge of how old the babies were?
> A.    Oh, sure. I've been around them most of my [sic] life, ever since they were born really.
> Q.    Do you remember when they were born?
> A.    I don't remember exactly what date, but I know when Nicole, their mother, had them, and she had triplets and they were around six months old at that time.
> Q.    In about April of '07, they were about six months old?
> A.    Yes, sir.
> Q.    Okay. So they had to be transported in baby car seats; is that right?
> A.    All the time, yes, sir.

*Id.* at 7-8.

Later, Howard Lewis, the victim's cousin, testified about the victim's substance abuse issues and home life:

> Q.    The - - was she a caretaker for her grandchildren?
> A.    She took care of her daughter, Nicole, her son, Keith. He had a bipolar disorder also and she just became a grandmother with three triplets, with triplet girls, before this happened.
> Q.    And was she actively participating in their care?
> A.    Much so, yes. Her daughter worked as often as she could and Cheryl would take care of the triplets.

*Id.* at 25, 28. Hazelwood's trial counsel lodged an objection, which was overruled. *Id.* at 28. The State then passed the witness. *Id.*

Finally, the State brought up the victim's grandchildren twice during its closing argument. The State commented:

> In the early morning hours of April 22nd of 2007, this woman, Cheryl Black, went to her friend's house. The friend's name is Elijah Davis. Now, her purpose in going to that house was twofold. Number one, Cheryl's daughter had just had triplets, they were staying in Cheryl's apartment, and she needed money to pay the rent. So she went to Elijah so she could get money to pay that rent.

ECF No. 21-3 at 9. Later, the State commented:

> And as he is pointing the gun at her and demanding the money, she - - as I told you in the opening statement, she had two choices to make. She could either give up that rent money and that triplet baby money or she could step on the gas.

*Id.* at 71.

The heart of Hazelwood's argument is that evidence concerning the victim's grandchildren was irrelevant and unfairly prejudicial. *See* Nev. Rev. Stat. § 48.035(1) ("Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues or of misleading the jury."). However, "[a] habeas petitioner bears a heavy burden in showing a due process violation based on an evidentiary decision." *Boyde v. Brown*, 404 F.3d 1159, 1172 (9th Cir. 2005), *as amended on reh'g*, 421 F.3d 1154 (9th Cir. 2005). "[C]laims deal[ing] with admission of evidence" are "issue[s] of state law." *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009); *see also Lewis v. Jeffers*, 497 U.S. 764 (1990) ("[F]ederal habeas corpus relief does not lie for errors of state law."). Therefore, the issue before this Court is "whether the state proceedings satisfied due process." *Jammal v. Van de Kamp*, 926 F.2d 918, 919-20 (9th Cir. 1991). In order for the admission of evidence to provide a basis for habeas relief, the evidence must have "rendered the trial fundamentally unfair in violation of due process." *Johnson v. Sublett*, 63 F.3d 926, 930 (9th Cir. 1995) (citing *Estelle v. McGuire*, 502 U.S. 62, 67 (1991)). Not only must there be "*no* permissible inference the jury may draw from the evidence," but also the evidence must "be of such quality as necessarily prevents a fair trial." *Jammal*, 926 F.2d at 920 (emphasis in original) (citation omitted).

The connection between the victim's triplet grandchildren and the money that Hazelwood attempted to rob from the victim is weak. Indeed, there is no evidence that the amount of money

the victim had on her person the day she was killed was linked to her grandchildren other than by the fact that they lived with her and the money was for rent. Nonetheless, although the evidence of the victim's grandchildren was only thinly relevant to why the victim had the money, it cannot be concluded that this evidence was "of such quality as necessarily prevents a fair trial." *Id.*; *see also Hovey v. Ayers*, 458 F.3d 892, 923 (9th Cir. 2006) (explaining that "even if there are no permissible inferences the jury can draw from the evidence in question, due process is violated only if the evidence is 'of such quality as necessarily prevents a fair trial'" and reasoning that "[w]e have held that admission of far more inflammatory evidence [than a young portrait and a description of the victim as a young girl] did not violate due process"). Further, "[u]nder AEDPA, even clearly erroneous admissions of evidence that render a trial fundamentally unfair may not permit the grant of federal habeas corpus relief if not forbidden by 'clearly established Federal law,' as laid out by the Supreme Court." *Yarborough*, 568 F.3d at 1101 (citing 28 U.S.C. § 2254(d)); *see also Dowling v. United States*, 493 U.S. 342, 352 (1990) (explaining that the Supreme Court has "defined the category of infractions that violate 'fundamental fairness' very narrowly"). And importantly, the Supreme Court "has not yet made a ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." *Id*.

Therefore, the Nevada Supreme Court's ruling was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, and was not based on an unreasonable determination of the facts in light of the evidence. *See* 28 U.S.C. § 2254(d). The Court will deny Hazelwood habeas corpus relief with respect to Ground 3.

///

///

## G.     Ground 4

In Ground 4, Hazelwood argues that his federal constitutional rights were violated when the state district court allowed the introduction of evidence that witnesses felt threatened, despite the lack of evidence that Hazelwood threatened or caused them to be threatened. ECF No. 18 at 22. Hazelwood explains that this evidence was presented for the sole purpose of bolstering the testimony of the State's witnesses. *Id.* In Hazelwood's state direct appeal, the Nevada Supreme Court held:

> Hazelwood asserts that the district court erred by overruling his objection to three witnesses' testimony regarding fear or intimidation. Aaron Noble, explaining two recantations he authored, testified that he was on the same cell block as Hazelwood while he was incarcerated, and that Hazelwood and his cousins intimidated him into writing these letters. This is sufficient credible evidence that Hazelwood was the source of the intimidation and therefore its admission was not error. *See Lay v. State*, 110 Nev. 1189, 1193, 886 P.2d 448, 450-51 (1994); *see also Mercer v. U.S.*, 724 A.2d 1176, 1184 (D.C. 1999) (explaining that evidence of threats against a witness are admissible to explain prior inconsistent statements). As to the other two witnesses, they testified as to their general reluctance to testify as a result of potentially being known as "snitches" in their community. Given the overwhelming evidence of Hazelwood's guilt—including the testimony of two eyewitnesses to the crimes—the admission of such irrelevant testimony is not reversible error. *Lay*, 110 Nev. at 1194, 886 P.2d at 451.

ECF No. 22-4 at 3.[2]

Hazelwood takes issue with the testimony of three witnesses—Noble, Daniels, and Owens—and with the State's closing argument. First, Noble testified that he went "through three different facilities, not just modules or just different places in one jail. [He had] been to three different jails because of this - - because of this case." ECF No. 20-5 at 104. Noble further explained:

---

[2] Hazelwood clarified that he is not challenging Noble's testimony that he felt threatened to write a retraction of his identification of Hazelwood. ECF No. 18 at 23 n.1.

I moved - - I moved from 5A, where we housed together, to the ninth floor. But
when I went from - - when I - - when I went to court and I got sentenced to prison
time, I got sentenced and I went to High Desert. I get into High Desert, I'm trying
to work, you know, program, do my little programs and stuff. I go from Level 3 to
Level 2, and I'm trying to work my way to Level 1 so I can get a job, all right. I
made it to Level 2, and somebody approached me about Mr. Hazelwood's case.
And so I had to go into PC, protective custody, and they moved me from High
Desert to Southern Desert. And so - - and now it's followed me to Southern Desert,
and I'm in the hole right now because I didn't want to PC up again, but, you know,
I actually threatened somebody to be put into the hold and so I could be moved
again to get away from it again.

*Id.* at 105.

Second, the State questioned Daniels about the effects of testifying in this case:

> Q.     Why do people in that neighborhood fear for their lives?
> A.     Because people have a tendency to think about what they've done,
>        and if somebody sees them do something, they may want to take
>        advantage on [sic] that fact. And I didn't want to be around if
>        anybody had came --
> Q.     Okay.
> A.     -- to do anything to me towards what I seen.
> Q.     Okay. Now, what about if you - - if they knew that you were
>        cooperating with the police and identifying the shooter? Do you - -
> A.     That's - -
> Q.     Do you feel - -
> A.     - - that's why, again, after I left her house, I went to my daughter's
>        house to stay away even further.
>        . . .
> Q.     Do you feel your life is in danger from coming in and testifying
>        about this?
> A.     Yes, to an extent, I do. I've heard threats.
> Q.     You have been threatened?
> A.     I have been threatened.
> Q.     Okay.
> A.     And I've heard statements made.

*Id.* at 33-35.

Third, Shalmane Owens was also questioned about the effects of testifying in this case:

> Q.     Have you been threatened?
> A.     Multiple times.
> Q.     Have you been threatened because you're testifying in this case?
> A.     Yeah.

| | |
|---|---|
| Q. | You - - |
| A. | Because of some paperwork that hit the streets. |
| Q. | That had to do with this case? |
| A. | Right. |
| | . . . |
| Q. | Are you concerned for your safety? |
| A. | I mean, I'm not worried about nothing. |
| Q. | But did you have to move out of that community because of this case? |
| A. | Yes. |

ECF No. 21 at 116, 118, 142-143.

Finally, the State made several arguments during its closing about the threats:

Now, let's talk about benefits for each of these people to come in here and testify. Let's start with Claire Daniels. First of all, she didn't go to the police. They came to her. She didn't run and go tell the police what happened. They came and found her. She had to move out of that area, had to leave her home because she feared for her life and she had been threatened. She's had to use the assistance of witness protection to relocate and buy her new clothes. And she said, if you work with the police, you are going to fear for your life. Yet she still chose time and time again to come in here and testify.

Claire Daniels came in here and did this because she wanted to tell the truth. When Mr. Ponticello asked her, is a snitch a good thing or a bad thing, Peaches said, I think it's neither/or, because of the simple fact if you see something happen that's wrong and you have to say what happens, that doesn't make you a snitch. It just makes you tell the truth about what took place. What benefit does Peaches have to come in here and take that stand and point to that man? What good possibly comes out of that? Nothing.

ECF No. 21-3 at 23. The State also commented:

Aaron Noble has had to be moved through three different facilities because of his testimony in this case, three different facilities. When I asked him, Aaron, can anything good happen to you from taking that stand, he wrote, Hell [sic] no - - or he said to me, Hell [sic] no. No, nothing good can come to me through this ever. He testified that the earliest he can get out of prison is six years.

So when he was done testifying, he went back to prison where he'll be for six years with what he called the snitch jacket on, six years. And like he said, snitches get stitches, yet he still chose to take the stand. Even though nothing good would happen to him, no benefit would go to him, he still chose to take that stand.

1    Shalmane Owens. He's also had to move from that location, relocate. He's
2    been threatened.

3    *Id.* at 25-26.

4           Similar to Ground 3, even if there was no relevance to the testimony that the three

5    witnesses felt threatened by testifying, as the Nevada Supreme Court held, *see* ECF No. 22-4 at

6    3, the Supreme Court "has not yet made a clear ruling that admission of irrelevant . . . evidence

7    constitutes a due process violation sufficient to warrant issuance of the writ." *Yarborough*, 568

8    F.3d at 1101. Therefore, the Nevada Supreme Court's ruling was not contrary to, or an

9    unreasonable application of, clearly established federal law, as determined by the Supreme

10   Court, and was not based on an unreasonable determination of the facts in light of the evidence.

11   *See* 28 U.S.C. § 2254(d). The Court will deny Hazelwood habeas corpus relief with respect to

12   Ground 4.

13   **H.    Ground 5**

14          In Ground 5, Hazelwood argues that the cumulative errors of the previous grounds

15   warrant reversal of his convictions. ECF No. 18 at 24. In Hazelwood's state direct appeal, the

16   Nevada Supreme Court held, "Hazelwood claims that the cumulative effect of error mandates a

17   new trial. We conclude that any error in this case, whether considered individually or

18   cumulatively, does not warrant such relief. *See Byford v. State*, 116 Nev. 215, 241-42, 994 P.2d

19   700, 717-18 (2000)." ECF No. 22-4 at 3-4. Because Hazelwood has failed to demonstrate any

20   errors, the Nevada Supreme Court's ruling was not contrary to, or an unreasonable application

21   of, clearly established federal law, as determined by the Supreme Court, and was not based on an

22   unreasonable determination of the facts in light of the evidence. *See* 28 U.S.C. § 2254(d). The

23   Court will deny Hazelwood habeas corpus relief with respect to Ground 5.

## V.   CERTIFICATE OF APPEALABILITY

The standard for the issuance of a certificate of appealability requires a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c). The Supreme Court has interpreted 28 U.S.C. § 2253(c) as follows:

> Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.

*Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see also James v. Giles*, 221 F.3d 1074, 1077-79 (9th Cir. 2000).

Applying this standard, the Court finds that a certificate of appealability is unwarranted in this case. The Court will deny Hazelwood a certificate of appealability.

## VI.   CONCLUSION

IT IS THEREFORE ORDERED that the First Amended Petition for Writ of Habeas Corpus by a Person in State Custody Pursuant to 28 U.S.C. § 2254 (ECF No. 18) is DENIED.

IT IS FURTHER ORDERED that Hazelwood is denied a certificate of appealability.

IT IS FURTHER ORDERED that, pursuant to Federal Rule of Civil Procedure 25(d), the Clerk of Court is directed to substitute Jerry Howell for Howard Skolnik as the Respondent warden on the docket for this case.

IT IS FURTHER ORDERED that the Clerk of the Court is directed to enter judgment accordingly.

DATED this 23rd day of October, 2019.

LARRY R. HICKS
UNITED STATES DISTRICT JUDGE